Good morning, Your Honors. May it please the Court, Jonathan Ipsen, Canterbury Law Group, on behalf of the appellants Anthony Maria and Maria Adrian. Your Honors, at this point I would like to reserve four minutes for rebuttal, and I'll make sure I keep an eye on that. All right, I'll try to watch as well. Yes, thank you, Your Honor. Your Honor, what we're here for is really a continuum of errors made by the district court throughout the discovery process culminating at trial. The odd conflux of the way all those errors happened was that they all focused really on documents and testimony that were sought through discovery by the plaintiff, but that the plaintiff didn't get the opportunity to receive. You have our briefs. Didn't get the opportunity? Yes, Your Honor. Of course, 15, 20 years ago, or 50 years ago, it was a very casual way of doing discovery. Now, most all courts, and certainly the Federal courts, do case management, and at the very beginning you have a scheduling order, and the district judge was trying to make you stay with that scheduling order and penalizing you if you didn't. When you say you didn't receive some information that you should have, what did you do to get it? That is, now attorneys have to be proactive. If they don't come up, you have to bring your motion and get the judge to do it. You can't sit back and say later on they haven't done it. I just don't understand your argument that this should have happened when you didn't weren't proactive to enforce the scheduling order. Yes, Your Honor. Well, to begin, you're right. The scheduling order did set down deadlines, and they should be adhered to. However, we're also bound by the ethical rules to be civil in our litigation with opposing counsel. As the record reflects, let's look at the part of obtaining the deposition of defendant's corporate counsel. All right? We had put out a 30B6 request for a deposition. Opposing counsel wasn't opposing our request. Rather, we were working out their schedule to allow the time for them to produce the witness. Could we have sat there and said, well, you're not giving us the witness when we demanded, and now we want to make a motion under Rule 37 to otherwise? But it's easy enough, counsel, to urge opposing counsel to say we'd like to complete this before we've got an order from the judge, so obviously we need to get this completed before then. If they're refusing to do that, then you have good grounds for going to the judge and asking for an exception or ask that the order be enforced. But that doesn't look like that's what happened here. You're right. It's not what happened here, Your Honor. What happened here was we had opposing counsel saying we can't make that date. I believe the second date that we tried, either opposing counsel or the witness was going to be on vacation, and the time frame that was going to be convenient for both of them. Did you explain any of this to the district judge? We tried to, Your Honor. In our rule fit, in our rule fit. The 6D motion. Yes, exactly, Your Honor. Here's the difficulty I have, maybe similar to some of the other questioning, is normally, okay, you say, look, this deposition isn't getting scheduled. And without imputing any bad faith to the other side or its witness, you say, we have a deadline, we have to do it, and if I can't get a firm date before this date, then I'm going to file a Rule 37 motion. And that puts them on modus, you haven't done it yet. Then they don't give you a date. I don't see how Rule 56 gets you out of the problem when you haven't filed a Rule 37 motion to compel. Maybe you can explain that to me. Sure, Your Honor. We had, if the Court will recall, a stipulation with opposing counsel to extend time to take this deposition. Correct. So under Rule 37, we're required to make a good faith basis to resolve the dispute before coming to the court. And you did that. But then you didn't come to the court. But we did by way of the stipulation. We believed our negotiating with the other side that, okay, if it's inconvenient for you and the witness to appear within the time frames of the discovery order, then consensually we resolved what would have been a discovery dispute by saying, well, we'll stipulate to extend the time frame so that we can take this witness, who we requested long before time had run out, after discovery. From our perspective, Your Honor, and perhaps we got this wrong, it would have been disingenuous for me at that point to say, I need to file a Rule 37 motion, because we really didn't have a discovery dispute. We had an agreement. It was just that the agreement was based on the witness's availability to perform that deposition after the deadline's closed, and not long after, Your Honors. We're talking a period, a very brief period of time. That's why, although, you know, depending on this Court's ruling, I guess it will guide how we go forward with Rule 37 motions. We always take it to be that a good faith effort has to be more than just a unilateral e-mail saying you've missed the time frames, discovery's going to be closing, and we're filing a motion. We thought that a stipulation resolving it where both sides agreed to have the deposition would have taken care of it. The district court disagreed. Beyond that, though, Your Honors, that same witness and that same, as His Honor suggested, that scheduling order should be adhered to, while that was strictly applied to plaintiffs, it wasn't. Yes, Your Honor. It's just a little odd, Counsel, because the stipulation says, look, we're trying to do this in good faith. There's no mention of the difficulty in getting the bank's witness. Correct, Your Honor. What you told the part, what you told the judge in paragraph 3 was that you had difficulty in meeting the deadlines because of conflicts caused by other cases. You know, that's a we're busy argument, and the judge wasn't real sympathetic to that problem. Correct, Your Honor. And there's no explanation in here that we've made repeated efforts to get a deposition set for the bank's witness, we've been unable to do so, and now we have a date, a date fixed by which we're going to do that. But in any explanation here, you might have persuaded the judge. But there's just no explanation. You're right, Your Honor. And, you know, part and parcel of that was we did have a consensual resolution and didn't see the need really to sit there and say opposing counsel was going to be on vacation, opposing counsel's witness was not going to be available, opposing counsel's witness could only be available at this time. In the spirit of trying to be cooperative, we didn't want to put that down there. Maybe we should have. But our main thrust was that we had consent from both parties to do this. To be honest, had I sat there and said I want the full recitation of all of the delay, I probably wouldn't have had a consensual stipulation, and I probably would have had a motion if I were going to put in everything that transpired. Well, the other thing that comes into play here, of course, is the discovery deadline is in the control of the court, not the parties. That's right, Your Honor. Absent an extension. And so I recognize you got sort of between a rock and a hard place because you had an internal discovery extension, but you didn't have a court-granted discovery extension, which is always a risky matter. So you're right, Your Honors. And that's why I say depending how this Court rules, it will depend, it will be the way we kind of look at those orders going forward. Sure. Now, though, if Your Honors are going to say that the order should be strictly applied with regard to that discovery deadline, then let's look at the August 29th deadline, whereby all parties were to supplement the Rule 26 disclosures. That deadline comes and goes. Defendants do not supplement those disclosures. All that's in there is a notation that says a corporate representative of the defendant will be speaking. Here's the problem, Your Honors. If the district court were to say plaintiffs should be punished for not taking the deposition within the timeframe, even though we had an extension to do it, by defendants' failures to desit to timely supplement their Rule 26 and put down a name, that would have given us the opportunity to then go forward and at least depose that named party. But did you bring that to the attention of the court at that time? We did, Your Honor, through our motions in limine, where we tried to exclude the witness. Right. But of course we couldn't before because there was no disclosure. The disclosure of that witness. But the lack of disclosure. I mean, now we know there is a 30b-6 type witness or a corporate representative on the table. So it seems to me that you say to them, well, who is this? I mean, I'm not going to, you know, normally in 30b-6 you don't necessarily even know who it is. You show up.  And we didn't. And you didn't. But you say, well, who is this? Because we're now on the verge of trial. And if this person is going to show up at trial, I need to take their deposition since this is the first disclosure. They say whatever they say. Maybe, sorry, we're not going to tell you. Play hide-and-seek. Then you go to the judge and say, here we are on the verge of trial. We have a, quote, 30b-6 designation without even a designation as to who or what. And we can't fairly go to trial with that. So the difficulty, once again, is not invoking the court's authority there where you feel that they potentially have violated the rules. I'm not saying whether they did it or didn't. But in your view, they did, correct? But we didn't have that view until trial, and here's why. When August 29th came, all right, we didn't know that there were going to be any other witnesses. I can't guess. You mean other than some corporate representative? Other than the corporate representative. Other than some corporate representative. And had you been in any negotiations with the opposing counsel to identify that? I directly wasn't, Your Honors. I wasn't. That means, then, that by the time you got to the district judge on the stipulation, you hadn't made any attempt to get a corporate to depose a corporate witness because you had no idea who you were deposing. There couldn't have been a scheduling conflict because there wasn't any you didn't know whose schedule you were dealing with. And maybe I misunderstood the question, Your Honor. I didn't know the specific person we were dealing with. We had put out a 30B6 request. So whoever that person was going to be, be produced. I, at that point, Your Honors, wasn't involved with the day-to-day handling of the file, but it's my understanding that we were being told that the person who's coming is unavailable. I don't believe we ever got a disclosure that it was going to be Jason Rock. At the time of trial, when they did put down this person's name of Jason Rock, is when we filed the motion to eliminate, saying it can't be both ways. You can't have let the time frame go by. You can't the district court then can't say we can't have the 30B6 designee, and then you can't now put this person up there without giving us the chance to depose them. Well, as I understood it, the information was only made of the recordings, which were also an issue here, was only available or were only available for impeachment purposes. Is that right? Well, that's what it was supposed to have been, Your Honor. And let's look at that. We, through discovery, specifically asked for recordings. Affirmatively, defendants said no recordings existed. This isn't the type of situation where, yeah, as evidence to professors will fondly say, you can use a bowl of spaghetti for impeachment. You can't use the bowl of spaghetti if we requested whether or not there was a bowl of spaghetti in discovery. Here what they said was, the spaghetti doesn't exist. There are no tapes. They said that through the whole of discovery, two times affirmatively in responses and informally in emails. Then they can't then show up on the eve of trial and say, we got these five recordings we just found, and then limit them only to impeachment purposes. Because what we were asking for on those tapes goes to the direct heart of the case. But beyond that, the district court further made a mistake by letting those tapes go a lot more than impeachment. As you can see from our objections on the record, Your Honors, there was no, the district court made a peculiar ruling when it stated specifically that the tapes would only be used for direct impeachment purposes. Direct impeachment as opposed to impeachment seems like the court was saying it's going to be much more narrow. I just wanted to let you know your time. Take a look at that. Thank you, Your Honor. And rather than waiting for rebuttal, if the court has more questions, I'd much rather entertain your questions. Thank you. I appreciate that.  Thank you, Your Honors. Thank you. May it please the court. Good morning, Your Honor. Robert Norman for the appellee. Your Honors, I'd like to address a few of the points that were just discussed by counsel and with respect to the discovery issue. In this case, Your Honors, the plaintiffs had seven months to do discovery. In the record, there's no evidence of a timely deposition notice for a Justin Rock or a 30B6. How are they supposed to get Mr. Rock's name? We need to get to Mr. Rock's name, Your Honor. What you would start with from the plaintiff's side is a notice, a 30B6 deposition notice. At the beginning of the case, we disclosed that there would be a 30B6 type representative. We did not know that it would be Justin Rock until weeks before trial when he is the person designated to fill that capacity. I think what's important to consider here is that the plaintiffs had notice at the beginning of the case of the type of testimony that the defendants were going to offer. That's what was set forth in our Rule 26 disclosures. The defense was going to talk about the loan, servicing issues, the communications between the parties. That's exactly what Mr. Rock testified. Mr. Rock was not some separate fact-percipient witness that knew something unique about this case. Let me just make sure I understand this, though. You're suggesting there was no notice that they wanted to take a 30B6 deposition. Is that what you're saying? There was no timely formal notice of deposition setting a date. Right before the close of discovery, the two sides had this negotiated extension of discovery, correct? Let me lead into that, Your Honor, yes. Okay. Let me ask you then, was that predicated in part on the fact that there would be a corporate witness from one West who would testify? Yes, Your Honor. We anticipated that there would be a corporate witness testifying. Because they told you they wanted that person, right? Well, we disclosed early in the case at the beginning of discovery that there would be that witness. It was not until literally the end of the discovery timeframe set in the scheduling order. So the answer is yes, when you all negotiated this stipulation, that the Adrians did give notice or advice that they wanted to go forward with a deposition of a 30B6 witness from your side, right? You knew that at that point. Your Honor, I would anticipate in virtually any case that the plaintiffs are going to want to pose more clients. No, you're not answering my question. Did they give you notice at that time that they wanted to take the deposition? They had indicated that they wanted to take a deposition before the discovery cutoff, yes. Okay. Well, what's wrong with that notice? And you knew that there would be a deposition of a 30B6 witness. That's a fairly common thing. So now are you standing here and saying, well, because it wasn't in a piece of paper that said notice of 30B6 deponent, that somehow it didn't matter in this discovery chain? Your Honor, the Federal Rules of Civil Procedure and the District Court Scheduling Order are very clear what it requires to compel a formal deposition to occur. You need the deposition notice. Did you tell them that you would make a 30B6 witness available? Your Honor, that was part of the stipulation that if the court is agreeable, if the District Court was agreeable to extending these deadlines, based upon the information offered by the plaintiffs, we weren't going to step on the court's shoes, so to speak, Your Honor. We would give that opportunity, but that was up to the District Court. Judge Martone was very clear from the beginning of the case, before the scheduling order was set, when he gave the parties an opportunity to discuss what type of timeframe would be necessary for discovery. He gave that authority to the parties. The parties agreed on the seven-month timeframe early on in the case. It was the plaintiffs who then didn't take advantage of that. The record that we have before us is that there was not a formal deposition notice set ahead of time. There was not our failure to attend a deposition. There was not a motion to compel detailing the allegations that are being made to the court. That's just not there. So your view is, and the practice that you have, that when this—we all know what the game plan is, and there's telephone calls going back and forth trying to convince to accommodate you and accommodate others. That's insufficient, and you can keep your mouth closed until the very end and then say, sorry, you didn't obey the scheduling order. Is that the way you practice law in Nevada? Your Honor, no, and I don't believe that's what the record shows what happened. What did happen? What happened was the plaintiffs made a request for a deposition at the very end of discovery. The appellees say, we're willing to accommodate, mindful that this is the end of a discovery timeframe set by a district court who is very serious about his rules and has the ability to be serious about his rules. It was within a matter of weeks. I mean, this is not, Your Honors, for example, a situation where they came to us six months before discovery closed or even two months before discovery closed and said, let's work on a date. How long was it before discovery closed? Your Honor, I believe it was literally within weeks before discovery closed. Weeks, plural? Approximately, Your Honor. I was not personally involved in the case at that time, but that's my understanding. So weeks before, they say, we want a 30B6 deponent. The bank, as I understand it, says, well, this person, whoever that may be, is not really available right now. Is that right? Essentially, yes. Okay. In hindsight. So there's kind of some back and forth of different dates and impossibility to appear at different times, correct? Yes, in an effort by us to be reasonable. Look, you're coming to us at virtually the 11th hour. Well, you know, if you have a discovery deadline and you got a couple weeks before it ends, does it matter it's at the 11th hour, the 12th hour, the 10th hour, if it happens before the discovery deadline? It did to Judge Martone, Your Honor, for a few reasons. Well, the reason that you didn't get the 30B6 before is because your witness, they were trying to accommodate the availability of your unnamed witness, correct? Well, I think there's more to that, Your Honor. I think they recognized they were up against a deadline, scurrying to do that. And so what Judge Martone did. But let's just be clear, in scurrying to do that, they were trying to work with you as to when that person could appear, right? Which is why we stipulated to extend the dates. Because the person couldn't appear before the discovery cutoff. Correct. Well, based upon their late inquiry to us, I mean, had there been a communication to us earlier in the case, it's likely that we would have been able to say, here are some available dates before that cutoff. But when they don't, I mean, it's not our job, Your Honor, to say you guys better hurry up and ask us for dates because you have a discovery cutoff coming up. Well, the alternative is not to ask you, just to send out a subpoena. That's correct. But we don't have that situation here. And if they would have had that situation here, I think the facts may be different with what Judge Martone did. So in other words, the cost of being cordial is losing out on the 30B6 witness. Or another way to look at that, the cost of not timely prosecuting a case. Were you able to take Anthony Adrian's deposition? Yes. October 3rd after the close of the discovery? We had noticed his deposition several months before the discovery cutoff. Mr. Adrian refused to attend a deposition claiming post-traumatic stress related to a separate lawsuit he had against his employer. We then had to go through the negotiation, the good faith meet and confer process when they relented, knowing that they could not have their name plaintiff refuse to testify. So unlike the plaintiffs, we were diligent in scheduling that deposition months before the discovery cutoff. But yes, Your Honor, it did happen on October 3rd. I may have some question in my own mind as a former trial lawyer as to how this should have been done. But we have before us, I take it Judge Martone had before the court all of the things we've talked about here and the district judge made a decision. What's our standard of view of that decision? Yes, Your Honor. All of this was vetted carefully before the district court. We're here on an abuse of discretion. Judge Martone who . . . We sort of leave it to the trial judge to figure those things out and to punish those who should be punished and to let off those who shouldn't be. And I take it your position is there was no abuse of discretion. That's correct, Your Honor. Judge Martone was very well reasoned in this decision and throughout the trial applying tough rulings to both sides. And that's clear, I believe, from the record. Judge Martone has spent an incredible amount of time on the bench and you could see that with his rulings at both the Arizona State Court, the Arizona Supreme Court, and then at the federal court. So, yes, these were well-reasoned decisions. I believe there's no evidence of any abuse of discretion. And even if there was not, or if there was, excuse me, Your Honors, some type of abuse of discretion, at best it would be harmless error because, again, these are all topics that were disclosed ahead of time. The Adrians knew what we were going to talk about, and that's what we talked about at trial. Your Honors, to address briefly the call recording issues that came up, we did our best to disclose those. And, in fact, the record shows the day they became available, which I was personally involved with the case, is the day we disclosed those to the other side. They were not previously available. We vetted this at length with the trial court through their motions in limine, through arguments during the trial as a jury would recess, the plaintiffs would want to bring these issues back up, and then for their motions for the adverse inference near the end of trial. These issues, the call recording issue was carefully considered by the court, again, back to that abuse of discretion standard. And, actually, the record shows that the appellee, One West, was sanctioned quite substantially by not being able to use these call recordings as substantive evidence in making the case. I mean, frankly, Your Honors, I thought the case was going to be dismissed on February 15th once we were able to locate these call recordings because they were so clear about the misrepresentations that the Adrians were making. That's why they were allowed to be used for impeachment evidence. Otherwise, as Judge Martone indicated, the plaintiffs would be enabled to testify with impunity without the fear of cross, excuse me, impeachment. Were they used in trial for cross-examination? They were used only for the impeachment purpose. I can recall the moment when a question was asked of Mr. Adrian, was he promised or guaranteed a loan modification, he adamantly testified, I was absolutely promised and guaranteed a loan modification. We were then able to use the impeachment testimony, a call recording, or in one call with Mr. Adrian's voice, two different times the One West representative at the beginning of the call and at the end of the call said there is no guarantee or a promise for a modification. You could see the body language of Mr. Adrian on the stand as he recognized he was impeached, which was insignificant for the jury. Even putting aside the call recordings, though, if we don't consider those, there was enormous other evidence before the jury to justify their verdicts. The Adrian's checking account records. So you're saying that even if he should have barred the recordings completely that it would be harmless error? That's correct, Your Honor, because there was a number of other pieces of information that the jury could have considered, especially given the inferences that would be allowed to One West Bank at this posturing appeal. There was the Adrian's HAMP application documents, filled out with their own handwriting, where they explain that they are requesting the modification, they have an inability to afford the loan. There's their bankruptcy schedules, which showed an approximate income of roughly $1,000 per month with expenses greater than $5,000. There were the Adrian's own handwritten notes and hardship letters, which went into various details of claims of medical challenges and other financial challenges. Nowhere in these records or notes was there any reference that someone promised a loan modification. The evidence came out that Mr. Adrian had actually left his employer in late 2010. He was in a dispute with his employer. He ended up suing his former employer. That was the truth of what was going on, and all of these other pieces of evidence, putting aside the call recordings, the jury could have easily considered to justify its verdict. Your Honors, I have nothing further unless there's any questions. Thank you. Thank you, Your Honors. You have some rebuttal time. Thank you, Your Honors. Your Honors, to address the issue of the calls that was raised by counsel, the call logs, the telephone logs, here's why it wasn't harmless error. As counsel pointed out, he played a recording for impeachment purposes. He failed to point out that he played it for 20 minutes of a phone call. Mr. Adrian on the stand had testified that he had over 70 to 80 telephone calls with the bank. He testified that he had telephone calls with different departments of the bank, one group being the modification department, the other being the collection department. What was played was one call from the collection department where the collector said that they were trying to collect on it and said exactly what was on the call. However, what happened by allowing five tapes to be produced on the eve of discovery without allowing all the rest of the tapes recordings to be produced, it put an improper perception with the jury. The jury then was led to believe these are the only tapes that exist, and the only tape they heard was the one that contradicted what Mr. Adrian said. Mr. Adrian never said every person he spoke to said that. He said every person from the modification department said that. Beyond that, Your Honors, and I'm running out of time, but just to point you in the record, their own witness, Justin Rock, admitted on the stand that we didn't have all of the phone logs, and he testified that there were different phone logs for different parts of the bank, and he explained that there would be a log for calls from the modification department and a log from calls from the collection department. He also stated that there would be a general phone log for when there was a call that might have come in from the borrower without giving a specific loan number. We didn't have all the docs. We had tapes that did put a perception on the jury that Mr. Adrian was lying. We didn't have the other 60-some-odd phone calls to be able to sit there and play, to rehabilitate Mr. Adrian, to sit there and say, here's one from the modification department where they said, if you default for a period of time, you'll get the modification if you get us over there. Yes, Your Honor. How did that issue get to the district judge? I assume what you're saying is, what you're leading to, is that you asked specifically for the district judge to give you all of the tapes at that time, and the district judge refused. Is that what happened? No, Your Honor. We asked for all the tapes during discovery. I understand that. We were told they didn't exist. They told what? We were told that the tapes did not exist. But then during the trial we found out they did exist. At trial we found out they did exist, and one of the things we asked for was either we need more time to get all these tapes and to find out why they only appeared recently, what efforts that defendant had actually made to respond to our discovery request to look for them. Was that a motion to the court? That was done, I'm trying to remember if it was done in the motion in limine. It was done in the motion in limine, and then also again orally before the court, where we made a subsequent oral motion pursuant to Rule 37 for sanctions. And what did they do? Yes, Your Honor. What did they do for sanctions? Correct, Your Honor. And the sanctions we were seeking was either that there be a negative inference instructed to the jury, that the jury be instructed that the jury must conclude that the other phone calls that Mr. Adrian testified to did exist because showing them only selected phone tapes and parts of phone conversations would give them the impression that there was nothing else out there to support him. What did the district judge do with your motion? Denied it. Did he give a reason? No, Your Honor. Okay. Thank you. Let me just ask you, I'm just looking at the transcript about the exhibit of the phone call that I think was used for the impeachment. It says a portion of the phone call recording. Yes, Your Honor. Was the whole phone call longer than 20 minutes? I believe there were two phone calls or three phone calls that were actually played. I know there were two that were excerpts. I believe one was a full phone call, and I think that was the 20-minuter. And at that point, before that was used for impeachment or during the time of impeachment, did you object to the extent of the use of that phone call? We did, Your Honor. Yes, we did, Your Honor. I think it might not have been the most articulative objections. I think it might have been, Your Honor, this is 20 minutes. Okay. Thank you very much. Thank you, Your Honors. If there are no further questions. I think not. Thank you for your time, Your Honors. Yes. Thank both of you for your arguments this morning. Adrian v. One West Bank is now submitted and we're adjourned for the morning.
judges: Wallace, McKeown, Bybee